Our next case is Mark William Baker at Owls v. United States. Mr. Kenrick, you're going to be first. We have extended some additional time to counsel on this case, so I'd ask that you be mindful of it, and so will we. Yes, sir. Thank you. If you guys may, please, the Kenrick on behalf of the appellants Mark Baker, David Oiler, and Bruce Long. I'll be arguing on behalf of all three of those defendants on three issues. There's a fourth issue that was in the brief that was just specific to Mr. Long, transferring a firearm to a felon. I'm happy to answer any specific questions about that, but probably won't spend a lot of time arguing that issue. The three issues that we would argue this morning are the failure to give an entrapment instruction to the jury, the failure to give a multiple conspiracies instruction to the jury, and the district court's denial of a Rule 29 motion on the conspiracy to commit RICO charges. Starting with the entrapment, your honors, there's two well-settled elements to entrapment. Inducement, lack of predisposition to commit the specific crime the person is charged with. Inducement is what we've concentrated on because I think that is where we get to the biggest dispute over whether or not this should have gone to the jury. Your honors, all we needed to prove in this case was more than a scintilla of evident inducement. It is a very low burden. The district court in a case like that should only assess the existence of that evidence, not its weight or credibility. It's entirely likely that that evidence could be improbable, unbelievable, weak, unpersuasive, and that shouldn't have any bearing on the decision. The jury gets the One of the points we made in our brief is that if you compare this to some of the other more familiar standards, this is lower than a preponderance of evidence, which only requires the probable existence of a fact. Which is why even if the evidence is unbelievable, it can't go to the jury. Looking at some of the cases that this court and the U.S. Supreme Court has considered related to entrapment in Fan and Pearl, which are the cases that I think it looks like that's where the more than scintilla language came from, the defendants in both of those cases initiated the crime without any government involvement. In other words, they were starting a criminal pattern and then the government came in to investigate. So obviously in those cases, there's nothing, there's no existence of any inducement, and there never could be under any circumstances. And that's I think where we get to the heart of the matter. Where is there a dispute? If we look at sort of how this entrapment defense developed, the Supreme Court has not been nearly as strict as some of the circuits have been with what is required to get this through the jury. When it started back in the 1930s with Sorrell's, there was almost no pressure involved in that case. There were a couple of questions asked to a bootlegger to get some liquor, and the court said, you know, that's that's got to go to the jury. They've got to consider whether that's entrapment or not. The relationship, there was a military camaraderie argument. As it goes through the rest of the cases in the Supreme Court, Sherman, Russell, Matthews, Jacobson, the court repeatedly says, if you've raised some evidence of inducement, then you get to go to the jury. What they have not done is required serious coercion, heavy pressure. And based on that, I think that what you can look at and determine is that they have, they've talked about relationships. In each of those cases, the government agent had some relationship to the defendant, and that's how they were able to coerce them into doing something. Mild forms of persuasion are fine. This court has said in Squillicote that, I will correct what I just said, more than a mild form of persuasion, but in that appeals to sympathy, friendship, need. The record in this case reflects that the confidential informant that worked for the government spun stories of extraordinary amounts of money. He built strong friendships and relationships with the members of the defendants in this case. He talked about his health problems. He talked about his financial problems. He had business investments with these people. He had loans with them. He built this relationship, and then he mined that these crimes, which we admitted to most. But if the government can, I mean, can create an opportunity for an otherwise willing defendant to commit a crime, and that's not supposed to be sufficient for an encrapment instruction, where does one draw the line? What is it about this case that makes it different from the run-of-the-mill case where the government simply creates an opportunity for an otherwise willing defendant to commit a crime? It's the relationship, Your Honor. And I think that what you have here is... Do you have to have complete strangers to a transaction? No, Your Honor, of course not. But the point of a relationship is, is there something beyond just solicitation? In other words, if the government says, hey, do you want to get some drugs for me, or do you want to become involved in some money laundering, that's solicitation. If the government uses someone who has a plus factor of influence, someone who has a stronger relationship, someone who has an extraordinary inducement they've given this person, then you get past that burden and it goes to the jury. I think the line that we're talking about, Your Honor, is not today whether or not we decide, were these men entrapped? The question is, was the jury able to do it? There isn't any way in 15 minutes I could recreate eight weeks of trial, even pointing to the parts of the record that we've pointed out in our brief and looking through, there's still not this overarching theory that we kept getting through with the CI and the FBI agent that there's more going on here than simply offering the opportunity to commit a crime. There's this deep intertwined relationship. There's secrecy. There's isolation. There's the CI saying that I was giving larger and larger enticements. I was trying to make it as good as I could make it. And that's where the line is, Your Honor. The line is, when do we send it to the jury? And I think that in most criminal cases, these issues should go to the jury as a practical matter. It wouldn't have made much difference from a standpoint of court efficiency or anything like that. The jury gets to consider this. And if there's no evidence of entrapment, if the government has a good case against it, then it would make no difference. But if it goes to the jury, then it takes it out of our hands where we're forced to look at a cold record and try to recreate what was going on in the trial. And I think that's the key to an affirmative defense, giving it to the jury. And that's what's critical in this case. Is there any argument that, I don't remember if this was made in the briefs, that you mentioned that even if the evidence is unbelievable, that's for a jury to determine. But if, in fact, we have some concerns about the merits of the evidence, is there a harmless error analysis here? No, Your Honor. Not with this low of a burden. And I think maybe I better use the word unbelievable as a specific term related to this argument. In other words, you don't believe it. Not that it's wild, crazy, or fantasy, but more in line with, I'm looking at this argument, and I'm looking at what you're saying, and it's not swaying me. That, I think, is a jury function. It isn't a judge function. So I think that when we're talking about, if there's an absolute absence, then we don't get the charge. But if there's not, we do. And again, that shouldn't change the outcome of a case if the charge goes to the jury, and the government's done their job. If the jury doesn't get the charge, then we have to have some doubt as to the outcome. You know, if there's no entrapment, there's no entrapment. But that's a jury decision. It isn't a judge decision, because to be a judge's decision, it has to be a situation where the judge weighs the credibility of the evidence, weighs the truth of the evidence. It's very similar to a Rule 29 argument, which we make all the time, and I've made unsuccessfully up here, that they didn't have enough evidence. And the response in the District Court and Court of Appeals is typically, they had something. They had something to get at the jury, let's let them decide. And I think that the only time we would find a Rule 29 was proper to be granted, when there was just nothing. And that's a very rare occasion. And I think in this case, there's no difference. If we've raised enough to get entrapment to the jury, they get it. We can't look at whether it was a good entrapment case, or whether we like it. We have to let the jury make that decision. So do I understand your standard to be that if the inducer, in this case, is a friend of the defendants, and he spins tales of significant financial gain, that's enough? It's a factor, Your Honor. But yes, I think an extraordinary financial gain, I think an appeal to sympathy, I think friendship, I think need, those are all factors that were mentioned by this Court's opinion in Squillicote, as things that could constitute the type of persuasion that would lead to an inducement. I don't think it has to be very much. Because again, we're not talking about winning the case on the grounds of entrapment. We're talking about being allowed to argue it to the jury. Obviously, I want to win if I argue it to the jury, but that's not a given. If it doesn't go to the jury, then it never comes up. And I think that's where the error is here. That we have to at least let them have it. You talk about it, you've only talked about it in this, how about predisposition? Your Honor, that was an issue that I guess I've struggled with how to address. The Court did not make us bring forth evidence of a lack of predisposition. But the government points out in its brief correctly that you probably could affirm if you found that there was enough predisposition to defeat an entrapment argument. So looking at the evidence of predisposition, that's one where the Supreme Court I think has been much, much looser as what they will say was a lack of predisposition. If you look at some of their past cases, in Sorrells, the defendant who they found should have the entrapment charge had a reputation as a rum case. In Sherman, the defendant had prior involvement in illegal drugs. And they found that there was still not enough predisposition to keep it away from the jury. In Russell, they actually addressed predisposition head on and said, it's fatal because you've conceded predisposition. So in that case, there was no evidentiary question at all. And then in, again, Jacobson, where you have a guy who's at least got some proclivities towards child pornography, they say, you know, he didn't have predisposition specific to this crime. So what we did raise through the testimony and what I think the agents admitted were that none of these men had criminal records. We looked at the evidence and the government I think disputed it with us. We argued that there was no real evidence that criminal activity had been going on before the government CI became involved with these men. And honestly, once he stopped contacting these men, they then stopped committing any crimes. That's what the evidence showed. It was in dispute, not nearly as hotly disputed as some of the other issues. We clearly raised enough lack of predisposition to send this to the jury. The courts have repeatedly said that when you're talking about a lack of predisposition, you're putting yourself out there for a searching inquiry into your mind. And a defendant runs that risk. In this case, it didn't happen. There was simply no evidence to show that these folks had a specific predisposition to commit these crimes that the government's informant got them to commit. Your honors, if there are no more questions on entrapment, I'll move on to my final two issues, the multiple conspiracies in the RICO. I only have a few minutes left. These are much simpler issues, I think, because they simply, they involve a lot of the facts here and they sort of go together. So I'll try to argue it that way to some degree. But in the multiple conspiracies, we asked for a multiple conspiracies jury instruction because when the evidence all played out by the end of trial, what you had was a series of unrelated, and I call them conspiracies for ease of argument, but they really weren't because you had Mr. Delilio as the central figure. I think an easy way to picture this is if we take this government C.I. Well, if he's the central figure, then how are they unrelated? Because he can't be a co-conspirator. So I guess when I say the central figure, let me make it clear, it's Mr. Delilio doing a deal, the C.I. doing a deal with Appellant Long, with Appellant Baker, with Appellant Oiler. But there's no connection between the three of them in relation to these criminal activities other than just the fact that this government C.I. is the person that kind of forms the linchpin of the activity, and he can't be part of the conspiracy. So if he's the connecting factor, then he can only be a connecting factor to each individual, and he can't be a co-conspirator. So there can't be an overarching conspiracy. A way to look at it would be if you take away the government C.I. and you make person one, two, and three, and you have the evidence that the government put up. What about the other dozen or 15 conspirators in this case? Again, there was no connection between them other than in relationship to Mr. Joe Delilio. So the evidence that came up here... As I recall your argument, at least on brief, your argument solely goes to the defendants that are represented here today and doesn't deal with all the other defendants in the conspiracy. I don't think that changes the equation, because if we look at the other people, we're not looking, first of all, at everyone charged. We're looking at everyone the government produced evidence of, and there were some facts in dispute. So again, talking about a jury charge, we had a correct position that there was... Again, if you have one, two, three separate people, and one person is dealing with Mr. Long, one person is dealing with Mr. Oiler, and one person is dealing with Mr. Baker. If there's no connection between those three outside of these three unrelated people, there's no overall conspiracy. What about the come up? I don't think that matters. Hells Angel is a membership in a motorcycle club. If we went through this evidence, this case lasted for eight weeks. The reason the FBI got involved with the Hells Angel Motorcycle Club was because there was this issue with the outlaw club and this geographic control. Not a shred of evidence arose about that in eight weeks of trial. Not a no violence, nothing. The membership in the Hells Angels was unrelated to this because, again, this wasn't happening before the government CI showed up, at least according to the government's evidence. It was related because the president of the club got a 10% kickback on all the money that these people made in these common things that they were doing. You know, I see my time's up. Again, Mr. Delilio was giving him 10% cutback. If you look at the first conversation, the only evidence I believe happened was that Delilio was giving money to Mr. Baker, and he says in the conversation that's recorded, hey, do you know I'm doing stuff with your guys? And he's like, not really. And you need to get some money. And his response each time is, OK, right. He says, you're the boss. This is tribute to you. This is how we do it up in New York where I was with the mafia and in federal prison. We've got to give you a little kickback. And Baker continues to say, OK. But again, the connection between those acts and Mr. Baker is government confidential informant. And that link breaks the conspiracy. There are no questions, Your Honor. Thank you. Good morning, Your Honors. I'm Mike Duncan here on behalf of Appellant David Euler, and I'm here to address the insufficiency of the evidence to support Mr. Euler's conviction on the 924C count in the superseding indictment. Mr. Euler was initially charged in May of 2012 along with the other defendants in this case, but was not charged with a 924C charge. That charge was added in following the search of his home, the bust of his home, at which time in June of 2012, at which time he was arrested, a number of government agents descended upon his home in Lancaster, South Carolina, and searched his home, arrested Mr. Euler, found a small user quantity of methamphetamine, and subsequent to that, in September, the superseding indictment was issued, and two counts were added. Two new counts were added against Mr. Euler, one being his possession with intent to distribute methamphetamine from the meth that was found in his residence, the second being this 924C count from three firearms that were found in his residence at the time of his arrest. The government contends that there was additional evidence, there was some other evidence that supported that charge, but the fact of the matter is the count was added only after his arrest and only after the search of his home. As the government points out in their brief, there was a phone conversation, excuse me, audio at the store location where Joe DiLulio operated a pawn shop, jewelry store, and it's at the very end of one conversation, and we're talking about, as to Mr. Euler, about four months of dealings with Mr. DiLulio being in that store, many times the government tapped Mr. Euler's phone for 60 days, they were on the wire for 60 days, and there is absolutely no evidence to support this charge other than the last three seconds of a, as Mr. Euler's leaving that store on one occasion in March of 2012. Sir? Sir, he says I've got my gun is what it sounds like. I will concede that it's clearer, it was clearer when I got it last week on request from the court than it appeared to be in the discovery. It wasn't played in the courtroom. Wasn't the jury entitled to believe that? You know, I've seen my times up with these. Thank you, sir. I think that given the utter lack of evidence other than that one instance in a garbled conversation as Mr. Euler is leaving, I do not believe is sufficient to support his conviction. Duncan, did you say that the tape was not played at trial? The audio was not played during the trial as I recall. I'll ask the government about that. Thank you very much, Mr. Littlejohn. Good morning, gentlemen. I'm Cam Littlejohn from Columbia. I represent Carlos Hernandez. I was also trial counsel for Mr. Hernandez. The one issue we have concerns his sentencing and the district court placing him in a criminal history category four as opposed to three. We contend that his 1989 conviction should not have been used as a basis for three criminal history points due to the fact that the 15-year window had expired. The window expired on December 31, 2011. Thereafter, there was evidence that did implicate Mr. Hernandez in the conspiracy, but prior to that time, the state of the record only has really three basis upon which the district court could have found relevant conduct during December 2011. The first item were toll records that the government introduced showing where Mr. Hernandez' telephone had connected with Mr. Chitwood's telephone on a number of occasions. There's no substance to the conversations. There's no indication in the record as to who was actually speaking during these telephone connections. Yes, Your Honor. Did or did not the period of incarceration extend into the 15-year period? He was totally discharged 15 years prior to December 31, 2011. So his 15 years began to run at that time. But as of December 2011, if that answers the court's question. Yeah, I think it does. All right. The state of the record was that there were these toll records that showed connections between Chitwood and Hernandez, but we contend the timing of these calls as opposed to the government's argument really showed nothing due to the vast number of calls between these two individuals who were actually best friends. I notice my time is up. Anything further you want to tell us about that? There were only two other things quickly. There was some reference in there that Mr. Oler said to the informant that he had a guy, and the record shows there was no connection between Oler and Hernandez. And then the last thing I would present was that the probation office and the district court relied on the testimony of Mr. Byram to corroborate the finding that the relevant conduct existed, whereas Mr. Byram's testimony really has nothing to do with Mr. Hernandez. They only met in 2012 at Mr. Chitwood's house. There were no drug dealings between Hernandez and Byram. I suspect the government's going to argue that even if there was a mistake made with respect to this conduct, that it's not going to matter in this context, given the district court's inclination to arrive at a sentence, a sentence that it did in this case, even without that additional relevant conduct. Well, Your Honor, I would hope the district court decided to sentence him at the low end of the guideline range. I would hope that if this court would agree with my argument and put him in the next criminal history category, that the court would again decide to sentence him at the lower part of the range, which is a difference of 27 months. All right. Thank you very much. Mr. Richard? Thank you, Your Honor. Jay Richardson with the U.S. Attorney's Office in the District of South Carolina. May it please the court, what the appellants have asked here in six issues is for this court to reevaluate the facts that Judge Curry found after sitting through more than six weeks of trial, listening and seeing more than 1,000 exhibits that were presented, several hundred of which were played in the course of the trial. To begin with Ms. Duncan's argument, exhibit 557 was played in the joint appendix at page 761. That was the description where he says at the end, I got my gun. It was in fact played, and we think that issue is relatively straightforward, unless anyone has questions about that. I want to start. So it was heard by the jury? It was. Joint appendix at page 761 is where it is played. This is a very difficult transcript, I suspect, to read for the court, because as the court reporter goes through, they don't type out the portions of the calls and recordings that are being played. For obvious reasons, that would be very difficult to do. But in playing them, so at page 761, what you see is me asking the assistant to play government exhibit 557, and then it says exhibit played. Where you then have to go is then you have to go to the transcript or the actual recording as you requested to see what was actually played. So it makes it somewhat difficult to pass through, but I think the record is very clear, or we tried to make it as clear as we could over the course of this long of a trial, as to what exhibit was being played when. And we included with the joint appendix here a number of transcripts that went along with those. We did not include all of them. There were hundreds of audio and video recordings, and obviously should the court have any questions about any of those, the government would be evaluating. I'd like to turn and talk a little bit about the entrapment charge. That seemed to be the issue that took most of Mr. Kendrick's time and seemed to be the focus of the issue. And what he says here for the first time, I believe, if you compare the briefs, is that what he's seeking is a solicitation plus friendship test. The court ensued, Judge Motz laid out a solicitation plus improper conduct or government overreaching. That was the sue test. That's what was laid out there by this court a few years ago. And instead what Mr. Kendrick suggests is that we should adopt a relationship plus friendship test. And I think that's not an accurate test. I don't think that's what's reflected. But I think first and foremost, before getting to the legal issue, I think factually it's wholly unsupported. And I think the reason that it's unsupported is if you look at the testimony and the relationship that occurred here, the only relationship that existed between the informant and Mr. Long, Mr. Kendrick's client, was a criminal one. In fact, Mr. Long began supplying cocaine to the informant before they had meaningful conversations. They met on August the 13th to discuss an array of communications about illegal conduct, drugs, guns, robberies, before there was any relationship between the substance. A previously provided loan existed before the government was involved, but that also was done through Mr. Byfield, who was sort of the central player in this in the beginning of the investigation. So I don't think the record reflects that there was a friendship here like in Sorrell's. And, you know, I think Sorrell's is an example where these two guys had been war buddies together. They had served together and he said, you know, I really need a drink, I really Right? And he, the informant, used that relationship as a improper sort of twist to make something happen. It's like if I went to my best friend and asked them to do something for me and I really turned the screws on them and told them about all the things that I'd done for them over the years, that that type of improper motive, what I think the court in, I believe it's Daniel, suggested as a non-criminal motive, right? You're doing this, do this for me because of this long history. We don't see any of that here. They don't present any evidence of that type of a relationship or friendship. And I think Judge Diaz, you hit on it very clearly that we can't require that they be strangers before they engage in criminal conduct, before they solicit illegal activity to They only deal with individuals that they trust, right? And so they have to develop a relationship before this group would ever let anybody in. So I don't think that the mere friendship is sufficient, but I don't think that they established that a friendship separate and apart from the criminal conduct ever existed, particularly with respect to Mr. Long in this particular case. What about the claim that we had a little bit more here in terms of the financial difficulties that some of these defendants were facing? It's not, your honor. In this particular instance, the only one who claims that in the briefs is Mr. Baker. And I think it's important to look at what Mr. Baker claims. His only evidence that he puts forward of financial difficulties is that some month or so, more than a month, six weeks after he accepts money, begins aiding in the one check. That's the whole evidence that they put on a financial difficulty. He's got a full-time job, right? He has two very nice motorcycles. The evidence is he traveled all around the country, including during this conspiracy, to various runs and Hells Angels events. He lives in a very nice house. This is not an individual who is destitute, who's unable to feed his children. Whether that would be sufficient or not, I think, is a much closer question. I don't think under Sue it's clear that it would be sufficient standing alone, particularly if, as in this case, the government doesn't know about it and certainly doesn't attempt to take advantage of that. This isn't an instance where the government is suggesting, oh, I know you need to feed your kids. All you need to do is give me a drink of liquor and I'll give you enough money to go feed your kids. That's the type of improper, non-criminal motive that might, under Sue, be sufficient. I'm not sure of that because I'm not sure that a mere solicitation along those lines would be enough. But certainly in this case where, one, it's not known that there is actually a financial difficulty different from everybody that exists. We all face financial difficulties of varying or being middle class or even being poor but non-destitute is certainly not sufficient. And Mr. Baker didn't present evidence that he was destitute in any shape, form, or fashion. But more importantly, because the focus on inducement is on government misconduct, it's whether the government tries to take advantage of that in some way. And at no point in the record, at no point cited or suggested by Mr. Baker is there any reference to the government trying to advantage of or play to this idea that Mr. Baker is somehow destitute and in dire need of money. So I don't think, particularly in this case, I think it's an easy example. I think it's a much harder question if you could ever have it. Could you ever have someone who was so destitute? And I think the answer to that is you would have to have the government using that, right? Using that right? That's that taking advantage of a non-criminal motive. It's not just that non-criminal motive exists. The government has to be taking advantage of it. It's on the government's conduct in that particular context. The answer to your question you asked about whether harmless error would apply under Scullicotti and Pissarro, it does apply in this context. We do think it would and to the extent that the court found that there was any evidence, which we don't believe that was any evidence presented, we do think the court would engage in the harmless error analysis. We mentioned that in a footnote to the brief. With respect to the multiple conspiracy instructions, unless anyone has further questions about the entrapment issue, I think with respect to the multiple conspiracy instruction, I think it's important to know a little bit about the timeline here. And I don't want to belabor this point because I get the feeling, particularly from your first argument, that y'all are all intimately familiar with the facts in this particular case. But I think what we see is not multiple conspiracies that are unrelated from one another, which is what would be required to get a multiple conspiracy instruction, but indeed a conspiracy that's tightly related. And it's related through the hell's angels and their leadership. And I think that's really reflected in a variety of different instances. And I'll run through them briefly. I won't belabor them given the time. But I think we see it begin on May the 13th, where Dan Byfield, who at the time was the president of the hell's angels, describes to the informant how a guy named Diesel, Bruce Wilson, who was a part of this group, an indicted co-conspirator, that Diesel was supplying guns for the hell's angels and he was given a cut of his profits back to the club. So that's the first time we see this organizational principle. That when people, and this is independent of the government, this is being described to the government but not involving government action, he's saying when Diesel does these guns, he makes these 45s, he was a gunsmith, he gives part of his profits back to the club. Sort of like a tithe. In fact, that was the, I believe Mr. Duncan during the trial used that example, because in fact they use a 10% tithe. That's the number that I believe is first mentioned specifically by Bruce Long on August the 13th. He describes at the end of a conversation where they've talked about drugs and guns and robberies and money laundering, he says in a context that is not perfectly clear, there was testimony it was related to drug dealing, there was testimony that it was related to profits he was making from pressure washing. Regardless, Mr. Long says I'm going to give 10% of my profits back to the club. And so what we see both in May the 13th but also in August the 13th from Mr. Long is this idea that this is how the club operates. That they're getting a tithe, the club, the leadership of the club are getting tithe as a result of the illegal conduct that is is both overarching but it's also very specific because on August the 5th we see Bruce Long supplying cocaine to the informant. But he's not doing it directly, he's brought into this drug supply relationship by Dan Byfield and Lisa Byfield. So the three of them are a conspiracy wholly independent of what is happening with the informant to supply narcotics. And we see as Bruce Long is convicted of that deal on August the 5th, that Bruce Long is involved in that, that Dan Byfield, Lisa Byfield, and Song Ming Anderson are all involved in that distribution, right? That's the conspiracy, right? And it's a conspiracy that falls under the Hells Angels umbrella. You hear on August the 19th and August the 23rd this description of how this works. Dan Byfield describes it. You're now going to be getting your drugs directly from Bruce Long but everything still runs through me, right? I'm the boss, right? That's Dan Byfield's description on the 19th and the 23rd. And then I think maybe the most revealing conversation during this group is on January the 5th where Dan Byfield describes what the Hells Angels does. He really sort of opens up and describes how this organization operates and he says, you know, the club, lots of these guys, lots of my brothers believe it's just about the money. And Dan goes on to explain, I like to believe. He didn't say does believe. He says, I'd like to believe it's about the brotherhood and the money, right? It's not, it's not, this isn't a motorcycle club that just gets together as friends, right? This isn't the friendly group of motorcycle enthusiasts. This is a gang and they're operating in a criminal space. They go on and they talk about what is happening at what they call church. Again, back to your tithing principle, they hold church which are their charter meetings, their chapter meetings, and they talk about how at church they are discussing the informant. And Dan says, you've been good to us, right? You've been good to the club and I'm telling everybody, right? I'll talk to He's describing how they operate. And he goes on and also reveals another aspect about the overarching nature of the club and how it operates. He talks about how the Hells Angels, this particular charter, has a bug sweeper, an electronic surveillance detection piece of equipment. You may be familiar with them. They often, sometimes are used in particularly secret hearings that they will run them around a room with security purposes to determine whether there are any listening devices that exist. And on January 5th, Dan Boffield describes how this is, how this Hells Angels club operates, right? The club runs background checks on individuals, right? They do that type of activity. And Dan Boffield also describes how he is the president of the Hells Angels, although at this point he is the vice president. He is now handed off the Mr. Baker. He always has someone with him with a gun, right? Why? Because this is a criminal organization, right? It's involved in criminal activities. And then we see, and I'll sort of just sort of finish with this idea on January the 18th. And I encourage the court to send there any questions about this. I think the description is very clear in listening to on January the 1699, the first conversation between the informant and Mr. Baker, where Mr. Baker is invited to take a leadership role in the criminal activities. And he's ready, willing, and able, right? Upon the first opportunity, he takes it. And he takes it immediately. And in doing so, what he says is, I'll make sure my guys straighten up. There have been a few problems. There have been some run-ins. I'll make sure they're straightened up. And I'm going to go talk to my guys, right? So I'm going to go conspire with my co-conspirators. I'm going to go talk to my guys, in particular, Euler and Pryor. Pryor is the guy who goes by the name of Yard Eile. The co-conspirator, he pled guilty. He's not before the court right here. I will tell them, it's OK to do this, all criminal activity. But you've got to remember me as the president. In other words, you've got to be kicking me. You've got to be tithing the president when you're engaged in these activities. And we see on January 19th and 20th that taking place, with Euler and Pryor, independent of the foreman, making those payments. We see it in a lot of other different ways. And I don't want to belabor Mr. Baker's involvement. But he is integrally involved with Mr. Byfield. He's integrally involved with Mr. Pryor, arranging for Mr. Pryor to supply additional firearms. He's involved with Mr. Thrower, another unindicted co-conspirator for distributing meth. He's involved with Mr. Enriquez, both getting him to supply pills and then subsequently delivering them himself. What we're seeing here is both an overarching group connection, but also individual connections. Bruce Long with Dan Byfield and Lisa Byfield. Mr. Baker with Mr. Byfield. Mr. Baker with Thrower and Euler and Pryor and Enriquez as part of this sort of criminal enterprise and the criminal organization. I would turn to any other issues that the court might have. The only other note that I had written down to respond to questions that have been asked earlier with respect to the outlaws. Mr. Kendrick suggested there was no evidence presented at trial of violence or activities involving the Hells Angels and outlaws. And that's because the court instructed us to not it in. The court determined that it was too prejudicial. We had information regarding a plan to engage in a firebombing of the outlaws. We had information about a stabbing that took place. We had information about an arson. What the court limited us to doing was to putting in evidence of where this, why this charter began. And this charter began, the evidence showed, because the National Hells Angels wanted to control this area because the outlaws were moving into it. As Mr. Euler described in a conversation I believe on March the 1st after a drug deal went bad, the Hells Angels control North Carolina and South Carolina. And when the outlaws had moved into the the National Charter started this group, the Nomad Charter in South Carolina, to keep the outlaws out, to maintain the control that the Hells Angels wanted over the state. That's why the charter was formed and we think that's what's reflected throughout this sort of criminal enterprise and organization. But what's your response to the arguments on Mr. Hernandez's I think what the evidence showed with respect to Mr. Hernandez is this. The question was whether Mr. Hernandez, by preponderance of the evidence for the court, was involved in the drug distribution in December of 2011. That was the question that was put forward for the court. And the court, evaluating the evidence, having sat through the trial, determined that it had. And here's what it was based on. Post-December we saw how the conspiracy operated because we went up on a wiretap and we established very clearly that Hernandez was supplying Chitwood, who was supplying Euler, methamphetamine. That was sort of the supply chain that we saw. And then we go back to December and there's no wiretap there. But we see the exact same pattern in PIN records, so the telephone records, showing the calls going from the informant to Euler, Euler to Chitwood, Chitwood to Hernandez and back. And in the conversations that we do have recorded with Euler, for example, Euler described circumstances that make very clear that this is his supply chain. This is who he's been getting it from. This is his close friend, Mr. Chitwood, who he had been a southern guy, that being Mr. Hernandez. We described sort of the detail of those connections, how it was coming from Atlanta. Just like when we get up on the wiretap, we hear that Mr. Hernandez is getting it from Atlanta. I think what we saw there and what the court found as a factual matter is that Mr. Hernandez was involved in two distributions and an attempted distribution in December that would put him within that 15-year window. He did that both based on the idea that we established this pattern of conduct that wasn't shown to have just begun. In fact, the record suggested that had been the ongoing pattern, the ongoing conduct where Hernandez is supplying Chitwood and Chitwood is supplying Euler. And so I think what the court found by preponderance of the evidence, and we think it's fully supported by the record, based on the toll records, based on the testimony at trial, is that that was the supply chain. And there was nothing in the record that suggests that that supply chain had been altered or was different in any manner, but instead that was the supply chain that took place in January, February, and March, was the exact same one that was taking place in December. What about Mr. Littlejohn's argument about the 15-year having expired? Well, that is I think the core of the issue. The 15-year window ended on December the 31st. And so if Mr. Hernandez's conduct, his engagement in the conspiracy, began prior to December 31st, then he's within the window and the criminal history applied. If it only begins after December 31st, then it's outside the 15-year window. So the interest and sort of relevance of his involvement in the December 9th, December 13th, and December 23rd transactions that Mr. Euler engaged in, that he got from Mr. Chitwood, that he got from Mr. Hernandez, the reason those are relevant and critical in this case is not because it's relevant conduct that increases his weight, but instead it's relevant to Mr. Littlejohn's argument because that puts him within the 15-year window. The window, the 15-year window from his criminal sexual assault of a minor conviction ended on December 31st. And so what Judge Curry found was the December 9th, December 13th, and December 23rd involvement by Mr. Hernandez was sufficient to put his criminal conduct within the 15-year window from his prior criminal sexual assault. That's the phone tree record that's your best evidence on that? I think that is, I think the phone tree evidence combined with the modus operandi that we see happening in January, February, and March, as well as combined with a number of sort of little nuggets that run throughout that I think corroborate the phone tree. For example, where Mr. Euler describes how he's got to get the dope from his good friend, his partner, that's Mr. Chitwood, who then has to get it from his suppliers, Mr. Hernandez. And the court allowed, without objection from the defense during the trial for, I'm sorry, over the defense's objection, allowed the agent, based on the context of the calls and his involvement in the investigation, to say that based on his interpretation, the individuals, the partner and his supplier that are being referenced there were in fact Chitwood and Hernandez, we think the record showed that pretty clearly in December. Thank you very much. Thank you, Your Honor. Mr. Kenrick, you've got some rebuttal time. Thank you, Your Honor, and may it please the court. I just wanted to respond to a couple of specific points and may not need all this time. I want to start with some of the government's positions on entrapment. It's not a solicitation plus friendship that I'm looking for here. In relation to the case of Sorrells, which was the very first entrapment case, these were not war buddies. What happened in Sorrells is a guy whose reputation as a rum runner is sitting at a bar. Undercover agent walks in and says, I was in some division in some war, and it happens to be the same one. And he says, oh, me too. And they sit at the bar for a little while drinking, go back to his house. I guess, I don't know what they were drinking, I guess not whiskey. And he keeps saying, I want to get some bootleg whiskey. And at that point, he says, so that relationship was just a few hours. And there was no overarching coercion, there were no threats. It was the relationship. It was the building of the relationship. It's important because we hear this all the time when we're talking about the Rule 29 context. Isn't the jury entitled to draw this inference, to make this finding, to make this decision? That's what we're asking for here. Let the jury make a factual determination. We're not for you to do is to put the evaluation of the facts in the jury's hand where it belongs, and it's the cornerstone of our trial system. Nearly every factual dispute goes to a jury. Not the gatekeeping function, where there is no factual dispute. That's a streamlining process to make a trial more efficient. But if there's some dispute, it ends up with the jury. And that's what we're asking to happen here. In response to the government's argument about Mr. Baker's difficulty, he did present evidence, some direct testimony through his mother that she had been paying bills, that he had lost his hours at work. The idea of destitution versus a rich person, again, it plays directly into the idea of a jury making this determination. Because an inducement to that destitute person, an inducement to an average person, an inducement to a billionaire, are all possible. But they're all going to be very different. So we let the jury handle that factual dispute. I think the question there is, how destitute is enough? That's what the government says. That's the wrong focus. The jury will answer that question, because it will change from case to case based on the targets, based on the activity, and based on the government. The theory, before I move on, behind entrapment that keeps showing up is that the government should not punish crime that it creates. And there's a lot of different exceptions to that. There's conditions to it. But that is the underlying philosophy of entrapment. And the jury should be entitled to make the determination of whether or not that occurred. I'll be brief. On the multiple conspiracies, if you look at how these deals play out, even in money laundering, drug dealing, the armed robbery, it's constantly a government CI talking to an individual saying, hey, don't tell anybody. Don't tell anybody you were here. Don't tell anybody what's going on. I don't want anybody to know what's up. And then he goes and he may give money to Mr. Baker or Mr. Byfield. But it's always the government CI who controls this activity, which prevents there from ever being a knowing involuntary agreement. There's no agreement between the two people, because they're separated by the government confidential informant. And I think that that's clear from the record. I'll just address one last point. I think this is outside of the record, but I think it bears addressing. The government wasn't prevented by the court from putting all this horrible evidence in, because she didn't want it in, because it was too prejudicial. The firebombing he refers to took place years before any of these men were members of Hell's No, and I bring it up because it was brought up by the government. The rebuttal is it's not in the record because it was irrelevant. I mean, you've seen the record. It's eight weeks of a lot of stuff. There was not a lot of limit on what the government could put in there. So I just bring it up that the three specific incidents of violence that the government mentions were not on the record for a very specific reason solely tied to irrelevancy. So they're as irrelevant to this argument as they were to the trial. What's not irrelevant is when I talk about there being no evidence of this big outlaw dispute or this gang activity as Hell's Angels members, I think we have to view it without looking at it through the lens of the membership in Hell's Angels, because it skews the opinion of what was going on. We need to look at the individuals, their relationships, and their relationships with the government agents. If there are no more questions, I'll conclude. Thank you, Your Honor. Mr. Duncan, you have a minute if you'd like to use it. Yes, sir. Very briefly. Your Honor, in response to the government's point of playing the audio, there were numerous exhibits, numerous audio played during the six plus weeks of trial. In the context of that evidence that was being presented, there's very limited, you know, a garbled end of a conversation as David Orler's walking out of his store, and nothing further, nothing else. And the problem with that charge with the refusal to grant my Rule 29 motion is that there were numerous firearms introduced into evidence. Mr. Orler had three firearms at his residence at the time of his arrest. They were introduced lying on a table. The jury was full of gun information, but it just wasn't tied to Mr. Orler's drug activity. Mr. Littlejohn. Very briefly with one minute. The pen register showed a number of calls, but it didn't show a pattern as the government would suggest. If you look at the record, there were hundreds of calls between Chitwood and Hernandez. They were best friends. They I don't think you can use a non-proton to show there were calls in February, so therefore, in December, there was relevant conduct. When Mr. Orler was speaking to the informant in December, he used the term my guy. The agent said on two occasions that my guy referred to Chitwood. There's no mention of Hernandez by Mr. Orler because he didn't even know Mr. Hernandez. The last issue about the agent's opinion, we would submit, of course, the agent had a vested interest in this case. On two occasions, when asked about my guy, he identified Orler as meaning Mr. Chitwood as being Orler's guy or his supplier. We just don't think there's any evidence really to show relevant conduct in December of 2011. Thank you very much. Again, I'd like to compliment all counsel on case well prepared and note for all counsel at the appellants table that your court appointed. The court's very appreciative of your taking these cases and as indicated in the first case, our system couldn't operate without your able assistance. So the court will come down and greet counsel and then we're going to take a very brief recess before we take our final case.
judges: G. Steven Agee, Albert Diaz, Henry F. Floyd